SIXTH DIVISION
 March 7, 1997













No. 1-95-2714
THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the
 ) Circuit Court of
 Plaintiff-Appellee, ) Cook County.
 )
 v. ) 
 )
BRIAN MONTEFOLKA, ) Honorable
 ) Paul J. Nealis,
 Defendant-Appellant. ) Judge Presiding.

 PRESIDING JUSTICE GREIMAN delivered the opinion of the
court:
 Brian Montefolka (defendant) was convicted by a jury of home
invasion, residential burglary and attempted aggravated criminal
sexual assault. Defendant was sentenced to 10 years' imprisonment
for home invasion, 7 years for residential burglary, and 10 years
for attempted aggravated criminal sexual assault, to be served
concurrently. Defendant appeals, raising issues as to whether:
(1) the post-crime "showup" was unfairly suggestive; (2) the
State should have been allowed to amend the home invasion count;
(3) defendant was proven guilty of the offenses beyond a
reasonable doubt; (4) the trial court erred in refusing
defendant's Telfaire instruction (United States v. Telfaire, 469
F.2d 552 (D.C. Cir. 1972)); and (5) the State's comments during
closing argument were improper. For the reasons that follow, we
affirm in part and reverse in part.
 The victim, Suzanne Bush (Bush), testified that she is 49
years of age and lives in Oak Forest, Illinois. On September 12,
1993, at approximately 4:30 a.m., Bush was sleeping in her
upstairs bedroom when she was awakened by her dog's whining and
went downstairs dressed in a nightshirt and underwear. Once
downstairs, she observed defendant petting her dog. Although the
interior of her home was not lighted, Bush was able to see
defendant clearly in the light from neighboring homes. 
 Bush asked defendant who he was and what he was doing in her
house. He identified himself as Bill Johnson and responded that
he did not think she was home and that if she did not try
anything, he would not hurt her.
 Bush ignored this admonition and ran screaming to the front
door. Defendant caught her at the door, placed her in a headlock
and dragged her by the neck into the living room. Defendant threw
her to the floor and a struggle ensued. Defendant's face was
"inches" from her own.
 During the struggle, defendant told Bush to take off her
underwear. Bush continued to struggle, but the more she fought,
the more defendant hurt her. Defendant continued choking her and
again told her to take off her underwear. Bush again refused and
the two continued to struggle.
 Finally, Bush was able to engage defendant in conversation,
asking him how and why he had broken into her home. Defendant
responded that he needed money for his family and had entered
through an unlocked window. Bush could smell alcohol and
cigarettes on defendant's breath. She asked defendant if he would
leave if she gave him some money. Defendant said "yes" and Bush
gave him between $10 and $60 from the kitchen counter. Bush
promised not to call the police and walked defendant to the front
door, locking it upon his exit. 
 Bush then dressed and crossed to a neighbor's house, where
the police were summoned. Bush described defendant to the police
as a male, possibly Hispanic, 5 feet 4 inches tall, 150 pounds
with dark hair, a light mustache and sideburns, and wearing a
dark "White Sox" T-shirt, brown leather jacket, baseball cap on
backwards and blue jeans.
 Approximately 40 minutes later, the police drove her to a
house located a few blocks away in Oak Forest, where they
believed they had located Bush's assailant. There was a party at
the house and the police brought out eight male guests and walked
each around the squad car. Before defendant reached the squad
car, Bush identified him and noted that he was no longer wearing
his leather jacket or baseball cap. Bush stated that defendant's
face "was imbedded in her mind" and would be there for the rest
of her life.
 Bush returned to her house with the police, who began
processing the scene for prints and other evidence. Bush
identified pictures of her injuries, including bruises on her
neck, arm, knees and shoulder, and blood by her ear, elbow and
leg. On cross-examination, Bush testified that defendant did not
touch her in a sexual manner, did not take off any of his own
clothing, and did not display a weapon. 
 Shirley Matthay (Matthay), Bush's neighbor, testified that,
on September 12, 1993, she was awakened at 4 a.m. by the dog next
door. Looking out her bedroom window, she observed a dark red,
two-door car parked in front of her house. As was her habit,
Matthay went outside with a flashlight and took down the car's
license plate number -- UH 2900. Matthay then walked to the
police station and reported the "suspicious" vehicle. When
Matthay returned, the car was gone.
 The Oak Forest police ran a computer check on the license
number and discovered that the Mustang was registered to Domingo
Montefolka, defendant's father. Officers were dispatched to the
Montefolka residence located in the Village of Oak Forest. 
 Officers Quinn and Badoni arrived at the Montefolka
residence and, as Quinn exited his vehicle, he observed a car
turn onto Ridgeland Avenue, stop in the middle of the street, and
then pull up in front of the house. The vehicle was a red Ford
Mustang with license plate number UH 2900. 
 Quinn approached the driver, identified later as the
defendant, and informed him that they were investigating some
criminal activity that occurred earlier and that his car was
possibly involved. Defendant told the officers that he had been
at a party all evening and had loaned his car to Brian Wilson for
approximately one half hour. Quinn described defendant as a male
Hispanic with a light mustache and sideburns and dark hair who
appeared short and weighed about 150 pounds. Defendant was
wearing a black T-shirt with "White Sox" written on the front.
Quinn did not observe a leather jacket or baseball cap.
 Officer Quinn, Badoni and defendant each drove separately to 
the address which defendant gave as the location of the party he
had attended. Defendant walked to the house ahead of the
officers. Officer Quinn testified that defendant opened the door,
rushed into the house and said, "The cops are here. I have been
here all night no matter what. They got me on some shit I did
earlier." Following this outburst, the officers handcuffed
defendant and placed him in custody.
 Quinn was present for the identification and observed
defendant, along with eight other male party guests, walk in
procession around the squad car in which Bush was seated. Bush
immediately identified defendant as her assailant.
 Daniel Hession hosted the party and testified that defendant
had been at his home for approximately 30 minutes, around
midnight, but had been asked to leave because he was "loud and
obnoxious." Defendant returned to the party an hour or two later
and was again asked to leave. Defendant was wearing jeans and a
brown leather jacket. 
 Defendant was placed under arrest and "Mirandized" by
Investigator Shaughnessy at approximately 6:30 a.m. on September
12, 1993. Defendant told Shaughnessy that he "did not do
anything" and had left the party only to get cigarettes at around
2 a.m. Shaughnessy took defendant's fingerprints for comparison
with the latent lifts he had taken from the scene. The
fingerprint and other forensic evidence was inconclusive in terms
of identifying defendant as Bush's attacker.
 Following closing arguments, defendant was found guilty of
home invasion, attempted aggravated criminal sexual assault, and
residential burglary, and not guilty of robbery. Defendant 
argues initially that the trial court erred in denying his motion
to suppress evidence of his identification, where the showup was
unnecessary and unfairly suggestive.
 Specifically, defendant contends that there was no exigent
need for the showup and that the procedure employed was highly
suggestive of defendant because no other participant was short
and "possibly Hispanic." The State maintains that the immediate
showup was necessary because the police were looking for a
suspect within minutes of the home invasion, burglary and
attempted sexual assault. The police were required to act
promptly to determine whether defendant was the perpetrator or
whether they needed to continue their search. Also, the form of
the showup was not unnecessarily suggestive and had a high
degree of reliability.
 We must determine whether the trial court's decision denying
defendant's motion to suppress identification evidence was
manifestly erroneous. People v. Smith, 274 Ill. App. 3d 84, 89
(1995). We note preliminarily that, although defendant and the
trial court characterize the identification procedure as a showup
or "hybrid," placing defendant in a group of similarly aged males
more closely resembles a lineup. For purposes of our decision,
however, this distinction is immaterial, and we will review the
trial court's "hybrid" analysis.
 An immediate showup near the scene of a crime can be proper.
Smith, 274 Ill. App. 3d at 89; People v. Manion, 67 Ill. 2d 564
(1977). Only when a pretrial encounter resulting in
identification is 'unnecessarily suggestive' or 'impermissibly
suggestive' so as to produce 'a very substantial likelihood of
irreparable misidentification' is evidence of that and any
subsequent identification excluded under the due process clause.
Smith, 274 Ill. App. 3d at 89; People v. Moore, 266 Ill. App. 3d
791, 796-97 (1994). The decision whether to permit a showup
identification is based on the following factors: "[t]he
opportunity of the witness to view the criminal at the time of
the crime, the witness' degree of attention, the accuracy of the
witness' prior description of the criminal, the level of
certainty demonstrated by the witness at the confrontation, and
the length of time between the crime and the confrontation."
People v. Poole, 167 Ill. App. 3d 7, 14 (1988), quoting Manion,
67 Ill. 2d at 571; Neil v. Biggers, 409 U.S. 188, 199, 34 L. Ed.
2d 401, 411, 93 S. Ct. 375, 382 (1972).
 In the present case, the facts demonstrate that Bush had
ample opportunity to view defendant from a variety of angles.
Defendant was facing Bush "at all times," including from such
distances as nine inches. Bush engaged in extended conversation
with defendant and was close enough to detect beer and cigarettes
on his breath. She accompanied him into the kitchen and walked
him to the front door. 
 Bush's description to the police was consistent and highly
accurate, the crime and showup took place within an hour of each
other, and Bush identified defendant out of a group of eight
without hesitation, stating later that she would never forget his
face. Bush's identification was inherently reliable and the 
trial court was correct to deny defendant's motion to suppress
identification evidence.
 Defendant argues next that the trial court erred by allowing
the State to amend the home invasion count against defendant. An
individual commits the offense of home invasion when:
 "without authority he or she knowingly enters
 the dwelling place of another when he or she knows or
 has reason to know that one or more persons is present
 or he or she knowingly enters the dwelling place of
 another and remains in such dwelling place until he or
 she knows or has reason to know that one or more
 persons is present and 
 *** 
 [i]ntentionally causes any injury to any 
 person or persons within such dwelling place." 720 ILCS
 5/12-11(a)(2) (West 1992). 
 The original grand jury indictment alleged that defendant
was guilty of home invasion because he "knowingly entered 16026
S. Long, Oak Forest, Cook County, Illinois, the dwelling place of
Suzanne B., when he knew or had reason to know that one or more
persons are present and intentionally causes harm to any person
or persons within such dwelling place." On May 4, 1994, over one
year prior to defendant's trial, the State sought leave to amend
the home invasion charge to reflect the alternative manner in
which defendant committed the offense. The trial court, over
defense objection, allowed the State to strike the phrase "when
Brian Montefolka knew or had reason to know that one or more
persons are present," adding in its place the phrase "and
remained in 16026 S. Long until he knew or had reason to know
that one or more persons was present."
 The manner in which the offense is committed is a formal
part of the indictment that can be amended pursuant to section
111-5 of the Code of Criminal Procedure. People v. Coleman, 49
Ill. 2d 565 (1971); 725 ILCS 5/111-5 (West 1992). Further,
defendant cannot claim surprise or prejudice, since the amendment
came a year before trial.
 Defendant next argues that he was not proven guilty of home
invasion, residential burglary and attempted aggravated criminal
sexual assault beyond a reasonable doubt. The relevant inquiry on
appeal is whether, upon viewing the evidence in the light most
favorable to the prosecution, any rational trier of fact could
have found the essential elements of the crime beyond a
reasonable doubt. People v. Young, 128 Ill. 2d 1, 49 (1989).
 Defendant challenges the sufficiency of the home invasion
count in its pre-amendment form, alleging that defendant did not
enter the Bush residence knowing someone to be home. Since the
count was properly amended to allege that defendant remained in
the home after realizing Bush was present, and defendant
undeniably did so, this argument is summarily rejected.
 So too is defendant's challenge to the residential burglary
charge. To sustain a conviction for residential burglary, the
State is required to prove that defendant unlawfully entered the
Bush residence with the intent to commit either a felony or theft
therein. People v. Monigan, 204 Ill. App. 3d 686 (1990). In the
present case, defendant was indicted for residential burglary
with the intent to commit robbery. A person commits robbery when
he takes property from the person or presence of another by use
or threat of imminent force. 720 ILCS 5/18-1(a) (West 1992).
 It is undisputed that defendant's entry into Bush's home was
unlawful. When asked by Bush why he was in her home, defendant
replied that "he needed money for his family." Defendant
assaulted Bush and left with between $10 to $60 in cash. Viewing
this evidence in a light favorable to the prosecution, the State
has met its burden of proof. See People v. Hopkins, 229 Ill. App.
3d 665, 672 (1992) (intent can be proved by circumstantial
evidence).
 Of more merit is defendant's challenge to his conviction for
attempted aggravated criminal sexual assault. A person commits
criminal sexual assault if he "commits an act of sexual
penetration by the use of force or threat of force." 720 ILCS
5/12-13(a)(1) (West 1992). The offense is aggravated where
defendant caused bodily harm to the victim or when it was
committed during the course of the commission or attempted
commission of any felony by the accused. 720 ILCS 5/12-14(a)(2),
(4) (West 1992). An individual commits attempted aggravated
criminal sexual assault when, with the intent to commit sexual
assault, he does any act that constitutes a substantial step
toward the commission of sexual assault. (Emphasis added.) 720
ILCS 5/8-4(a) (West 1992).
 To sustain a conviction for attempted sexual assault, proof
of specific intent to commit the offense of sexual assault is
essential; however, such intent may be inferred from the
circumstances of the assault. People v. Beason, 32 Ill. App. 3d
305 (1975). A defendant cannot be convicted of attempted
aggravated criminal sexual assault absent evidence that he had
taken a substantial step toward completion of the forced act of
penetration. People v. Webster, 175 Ill. App. 3d 119 (1988).
 After reviewing basic principles, we return to the specific
facts of the case at bar. Bush found defendant on the first floor
of her home and after an exchange of words, clad only in a
nightshirt and underwear, ran to open the front door and escape.
Defendant followed her to the door. The following testimony was
elicited on direct examination:
 "Q. What did you do?
 A. I started to run and scream hysterically toward
 the front door *** I twisted the lock and tried to get
 the door open and he was on top of me by then, and we
 were fighting at the front door.
 Q. When you say he was on top of you, what do you
 mean?
 A. He was fighting with me *** he was trying to
 get my hand away from the door. And the next thing I
 knew he had me in a headlock and he dragged me into the
 fron